UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
STEVEN M. GREENBAUM, *et al.*,      )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )        Civil Action No. 02-2148 (RCL)
                                    )
ISLAMIC REPUBLIC OF IRAN, *et al.*, )
                                    )
            Defendants.             )
_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

These actions arise from the August 9, 2001 suicide bombing of a restaurant in downtown Jerusalem, Israel.  Plaintiffs, the husband, parents and estate of a woman killed in the attack, allege that the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") are liable for damages resulting from the attack because they provided material support and assistance to Hamas, the terrorist organization that orchestrated the bombing.  As such, defendants are subject to suit under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604.

### PROCEDURAL HISTORY

On October 23, 2002, plaintiffs filed their original complaint seeking redress for their losses under the FSIA.  On August 21, 2003, this Court ordered service upon the defendants through diplomatic channels in accordance with 28 U.S.C. § 1608(a)(4).  Plaintiffs filed proof of service in accordance with the statutory procedures and sought entry of default on January 5, 2005, the defendants having failed to answer.  On June 3, 2005 this Court entered default against

the defendants, Iran and MOIS, on November 16, 2005, pursuant to 28 U.S.C.§ 1608(e) and Fed. R. Civ. P. 55(a).

Notwithstanding the indicia of defendants' willful default, this Court is compelled to make further inquiry prior to entering a judgment by default against defendants.  In addition, FSIA requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court."  28 U.S.C. § 1608(e); *see also Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 6 (D.D.C. 1998) (Lamberth, J.). "In evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence.'' *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (Urbina, J.) (quoting *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000) (Green, J.)) (internal quotations omitted).  Plaintiffs' evidence may also take the form of sworn affidavits or prior transcripts. *See Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002) (Lamberth, J.).

During the pendency of this action, the United States Court of Appeals for the District of Columbia and other judges of the District Court for the District of Columbia have issued a number of decisions which have implications as to the plaintiffs' claims and damages, including, but not limited to, whether statutory causes of action exist under FSIA.  *See Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004); *Acree v. Republic of Iraq*, 370 F.3d 41, 59-60 (D.C. Cir. 2004).  *See also Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 (D.D.C. 2005) (Bates, J.) ("*Dammarell II*"); *Holland v. Islamic Republic of Iran*, 2005 U.S. Dist. LEXIS 40254, Civ. A. No. 01-1924 (CKK) (D.D.C. 2005) (Kotelly, J.); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105 (D.D.C. 2005) (Bates, J.); *Kilburn v. Islamic*

*Republic of Iran*, 277 F. Supp. 2d 24 (D.D.C. 2003) (Urbina, J.).  In light of these recent changes

in law, the Court directed plaintiffs to brief the effect of intervening case law, and they filed a

memorandum to that effect on January 11, 2006.  Plaintiffs subsequently submitted, on June 11,

2006, their Proposed Findings of Fact & Conclusions of Law.

This Court finds that plaintiffs need not file an amended complaint in order to raise their

state law claims.  Although plaintiffs' initial complaint was filed before many of the cases

reinterpreting FSIA claims were decided, the complaint nonetheless sufficiently raises the issues

to put the defendants on notice as to the basic facts underlying the claims and the relief sought.

*See* FED. R. CIV. P. 8(a)(2); *cf. Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (noting

that, in a discrimination case, asserting the elements of a prima facie case should not be required

at the pleading stage).

In their complaint, plaintiffs specifically invoked New Jersey law to the extent federal law

did not control because, as the last residence of the decedent, it has the strongest interest in the

resolution of this case.  While plaintiffs neglected in their complaint to reference California law,

which governs the claims of the decedent's parents, choice of law is not required in the initial

complaint.  Rather, it is a matter of argument and briefing.  *See, e.g., Krieger v. Fadely*, 211 F.3d

134, 136 (D.C. Cir. 2000) (noting that the complaint need contain "only a short and plain

statement of the claim for relief") (internal quotations and citations omitted); C. WRIGHT & A.

MILLER, FEDERAL PRACTICE & PROCEDURE § 1219 (2d ed. 1990).  In light of the foregoing, this

Court finds that plaintiffs shall not be required to file an amended complaint.  Relief may be

granted on their initial complaint.

Plaintiffs' liability and damages claims are supported by the evidence presented in the May 19, 2006 hearing on liability. Based on all of the evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiff and against defendants Iran and the MOIS.

## FINDINGS OF FACT

1.  Plaintiff Steven Greenbaum was born in Brooklyn, New York. (Trial Tr. 5/19/06 at 85.) He is an American citizen who is domiciled in New Jersey. (*Id.*) He and Judith Greenbaum were married. (*Id.* at 88.) He is a plaintiff is in own capacity and as administrator of his late wife's estate.

2.  Decedent Judith Greenbaum was born in Los Angeles, California. (*Id.* at 12.) At the time of her death, she was domiciled in New Jersey. (*Id.* at 85.)

3.  Plaintiff Alan Hayman was born in Los Angeles, California. (Trial Tr. 5/19/06 at 10.) He is an American citizen who was domiciled in California at the time of his daughter's death. (*Id.* at 10-11.)

4.  Plaintiff Shirlee Hayman was born in Chicago, Illinois. (*Id.* at 56.) She is an American citizen who was domiciled in California at the time of her daughter's death. (*Id.*)

5.  Judith Greenbaum was raised in an orthodox Jewish home. As a teenager, she excelled in academic and creative pursuits and enjoyed a number of close friendships. (*Id.* at 58.) She wanted to be a teacher from a very young age, and as an adult, she worked as a teacher in Jewish schools in Los Angeles and New York. (Trial Tr. 5/19/06 at 13-14, 59.) From the beginning of her career as a teacher, she was very close to her students, and was extremely dedicated to them. (*Id.* at 58-59, 92-95, 116-17.)

6.      The Greenbaums met through a matchmaker in the fall of 1999 and were married on

April 3, 2000.  (*Id.* at 88.)  The wedding was attended by over 300 people, including

many of Judith Greenbaum's students.  (*Id.* at 17-18.)

7.      In late June 2001, Judith Greenbaum traveled to Jerusalem, Israel, and began a six-week

study abroad program to complete her graduate studies.  (*Id.* at 22-23.)  She had recently

learned that she was pregnant, and she and her husband were very excited about starting a

family.  (Trial Tr. 5/19/06 at 25, 54, 95.)  Steven Greenbaum visited her in Jerusalem for

four weeks, and their time together was some of the happiest of their lives.  (*Id.* at 96.)

He remembers that she liked the Sbarro restaurant, because she was able to eat the food

even though she was suffering from nausea associated with the pregnancy.  (*Id.* at 96-97.)

8.      Steven Greenbaum left Jerusalem and returned to the United States in early August.  (*Id.*

at 96.)  After his departure, he and his wife spoke by telephone every day.  (*Id.* at 97.)  By

August 9, 2001, Judith Greenbaum was looking forward to her planned return to New

Jersey a few days later.  (Trial Tr. 5/19/06 at 63, 98.)  While she was looking forward to

starting a family, she intended to continue teaching after the child was born, and likely

would have continued teaching at some level throughout her life.  (*Id.* at 83, 92.)

9.      The Haymans were well aware of the terrorist activity occurring in Israel.  (*Id.* at 24, 62.)

While in Israel, Judith Greenbaum called her parents regularly.  (*Id.* at 25-26.)  Both her

parents were very close to her.

10.     On August 9, 2001, a member of Hamas entered the Sbarro restaurant in Jerusalem and

detonated a ten-pound bomb.  (Dr. Clawson Dep. (Ex. 14) at 18; *see also id.* at 10-12

(citing U.S. Dep't of State, 2002 Patterns of Global Terrorism (Ex. 16) at 80.))  The

ensuing explosion killed fifteen people, including Judith Greenbaum, and wounded more than 130 others.  (*Id.*)

11. Subsequent confessions and other statements to Israeli police and news organizations verified that Hamas was responsible for the attack.  (*Id.* at 18-20.)

12. "Hamas, the popular name for the Islamic Resistance Movement, is an organization supported by The Islamic Republic of Iran, dedicated to the waging of Jihad, or a holy war employing terrorism with the object of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of the Muslim religion over all of Palestine, including all territory of the State of Israel."  *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 79, ¶ 10 (D.D.C. 2006) (Lamberth, J.) (quoting *Weinstein*, 184 F. Supp. 2d at 19, ¶ 24); *see also Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3, ¶ 5 (D.D.C. 2001) (Bryant, J.); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, ¶ 17 (D.D.C. 2000) (Lamberth, J.).

13. Defendant Iran actively provided material support to Hamas during the period immediately preceding the attack.  (Dr. Clawson Dep. (Ex. 14) at 27 (describing Iranian support for Hamas in 2000-2001 as being "at a fever pitch")); *see also Bodoff*, 424 F. Supp. 2d at 79, ¶ 12; U.S. Dep't of State, 2002 Patterns of Global Terrorism (Ex. 16) at 64-65.)

14. Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984."  *Bodoff*, 424 F. Supp. 2d at 79, ¶ 13 (quoting *Weinstein*, 184 F. Supp. 2d at 20, ¶ 28); *see also Mousa*, 238 F. Supp. 2d at 4, ¶ 9;

*Eisenfeld*, 172 F. Supp. 2d at 5, ¶ 21; *Flatow*, 999. F. Supp. at 11, ¶ 19; *cf.* Dr. Clawson

Dep. (Ex. 14) at 12, 23-25.

15.    Judith Greenbaum's death was caused by a willful and deliberate act of extrajudicial

killing because it resulted from an explosion of material carried into the Sbarro restaurant

in Jerusalem on August 9, 2001, intentionally detonated by a restaurant patron acting as

an agent of Hamas.  (Dr. Clawson Dep. (Ex. 14) at 15-20.)

16.    As a result of the death of Judith Greenbaum, her Estate suffered a loss of accretions that

would have been expected to occur during the course of her anticipated life expectancy in

the amount of $879,023.  (Dr. Lurito Rep. (Ex. 3) at 1-3.)

17.    After the bombing, Judith Greenbaum was taken to a hospital emergency room.  She had

suffered "severe entry wounds of penetrating bullets."  (Bikur Cholim Hospital Record

(Trans.) (Ex. 5) at 5.)  At the hospital, she was pronounced dead on arrival as a result of

her injuries.  (*Id.*)  There is no evidence that her injuries caused her pain or suffering

before she died.

18.    August 9, 2001 began as normal day for Mr. Hayman.  Upon his arrival at work, he

reviewed the news from Israel, as was his daily habit, and saw that the Sbarro restaurant

had been bombed and that many people had been killed.  (Trial Tr. 5/19/06 at 26-27.)

19.    He immediately called his daughter's cellular telephone.  (*Id.* at 27.)  She did not answer,

which was "very unusual."  (*Id.* at 27.)  It was also unusual that Judith Greenbaum had

not already called them, as she usually did so after such attacks to reassure her family that

she was safe.  (*Id.* at 28.)

20.     Mr. Hayman then made several telephone calls in search of news about his daughter.  He

called his brother in Israel, Pinchas Hayman, but was advised that he did not know where

his daughter was.  (*Id.* at 28.)  He called Steven Greenbaum, who had not heard of the

bombing but assumed she was not hurt because he had spoken to his wife just one hour

before the bombing.  (Trial Tr. 5/19/06 at 29.)  He called one of his daughter's very good

friends in Israel, but she had not heard from Judith Greenbaum.  (*Id.* at 30.)  He called his

father in Israel, who told him that someone at the school where Judith Greenbaum was a

student had seen her after the bombing.  (*Id.* at 29.)  Shortly thereafter, his father called

back, however, and advised his son that the information from the school was mistaken:

Judith Greenbaum had not been seen after the attack.  (*Id.* at 30.)

21.     Mr. Hayman waited for news, feeling extremely anxious.  (*Id.* at 30.)  He believed his

daughter must have been harmed in the attack because otherwise she would have called.

(Trial Tr. 5/19/06 at 30-31.)  Finally, around 12:00 p.m., Mr. Hayman's brother called

and told him that some of his daughter's class notes had been found in the street outside

the restaurant.  (*Id.* at 31.)  His brother advised him to go home immediately and said he

would call when more news became available.  (*Id.*)

22.     Mr. Hayman called his wife, Shirlee Hayman, and told her that there was a bombing at a

Sbarro restaurant in Jerusalem and that their daughter might have been involved.  (*Id.*)

Mrs. Hayman was extremely distressed, remembering that Judith Greenbaum enjoyed

eating there.  (*Id.* at 31, 63-64.)  Mr. Hayman left his office and drove to the hospital

where his wife worked, approximately a forty-five minute drive.  (Trial Tr. 5/19/06 at 31-

32.)  As he waited for his wife outside the hospital, his brother Pinchas called and told

him that his daughter was dead.  (*Id.* at 32.)  Mrs. Hayman arrived at the car, and upon

hearing the news, felt "a tremendous sense of . . . pain, loss, numbness."  (*Id.* at 32, 64-

65.)  They then drove home, arriving approximately twenty minutes later.  (*Id.* at 33.)

23.     Within minutes, two Rabbis arrived at their home.  (*Id.*)  Because of custom and religious

laws about the sabbath, the funeral was to be held less than twenty-four hours after Judith

Greenbaum's remains were identified.  (Trial Tr. 5/19/06 at 33.)  Because of the length of

travel time and the time change between California and Israel, Mr. and Mrs. Hayman

could not arrive in time to attend the funeral before the sabbath.  (*Id.* at 33, 35.)  Thus,

they were not able to attend their daughter's funeral.  (*Id.* at 33.)

24.     Mr. Hayman spoke to Steven Greenbaum, who was very upset.  (*Id.* at 34.)  Although

Steven Greenbaum would have been able to fly from New Jersey to Israel in time to

attend the funeral, he was afraid that it was not safe to travel to Israel.  (*Id.*)  Steven

Greenbaum ultimately decided to make the trip, however, accompanied by his Rabbi.

(Trial Tr. 5/19/06 at 34.)

25.     Steven Greenbaum arrived in Israel on Friday and traveled immediately to the cemetery,

where he was a pallbearer in his wife's funeral.  (*Id.* at 102-03.)  The next day he returned

to the United States and began the seven days of mourning at his rabbi's home.  (*Id.* at

103-04.)  He received many visits and letters from his wife's former students and others.

(*Id.* at 104-05.)

26.     The Haymans had begun the seven days of mourning immediately upon arriving home on

August 9, 2001.  (*Id.* at 33.)  During that period, they did not leave their home.  (Trial Tr.

5/19/06 at 36.)  They received a large number of guests who came to support them as they

grieved.  (*Id.* at 65.)  Mrs. Hayman describes taking comfort from a stuffed animal she

had purchased as a gift for their unborn grandchild, a dog that reminded her of one that

Judith Greenbaum had once owned as a child.  (*Id.* at 65-66.)

27.     As the Haymans mourned, their distress was heightened when an Arabic speaker called

their home and threatened them.  (*Id.* at 52-53.)  They hired a security guard to stay

outside their home at night.  (*Id.*)

28.     Although the Haymans received an audio tape of the eulogies delivered at their daughter's

funeral, they were unable to listen to it for several days.  (Trial Tr. 5/19/06 at 37.)  Mrs.

Hayman also describes being unable to view, for six months, a photograph of her

daughter and son-in-law in front of the Sbarro restaurant.  (*Id.* at 71.)

29.     Approximately one month after their daughter's death, the Haymans traveled to Israel for

the *shloshim*, a service held on the thirty-day anniversary of her death.  (*Id.* at 38.)  While

attending the service was very difficult for the Haymans, it was also meaningful,

particularly when the monument marking their daughter's grave was unveiled, which

contained an inscription that they had helped to write.  (*Id.* at 40, 67.)  Part of the

inscription was chosen by Steven Greenbaum, who selected a quote that was meaningful

to him because it was on his grandfather's gravesite.  (*Id.* at 115.)

30.     Upon their return to the United States, the Haymans attended a *shloshim* in New York

near the school at which their daughter had taught.  (*Id.* at 41-42.)  Many of Judith

Greenbaum's former students, colleagues and friends spoke at the service, and wrote

letters to the Haymans about Judith Greenbaum's impact on their lives.  (Trial Tr. 5/19/06

at 41-45, 55; Ex. 10 at 1-7.)  Articles about the service, the memory of Judith Greenbaum,

and the impact she had on her students appeared in both New York and Los Angeles newspapers.  (Trial Tr. 5/19/06 at 41-42; Ex. 12 at 25-28.)  The Haymans were very moved by the service and the letters.  (Trial Tr. 5/19/06 at 68-69.)

31.  The September 11, 2001 terrorist attacks occurred within days of the Haymans' return to the West Coast, and caused Mr. Hayman to suffer painful memories of the days surrounding his daughter's death.  (*Id.* at 52.)  Steven Greenbaum also suffered renewed distress on that day.  (*Id.* at 107.)

32.  The Haymans continue to miss their daughter and remember the ways she touched their lives.  (*Id.* at 53-54, 63.)  Even after she moved across the country, they felt very close to her and spoke to her often.  (*Id.* at 60.)  They mourn not only the loss of their daughter, but also the loss of their unborn grandchild.  (Trial Tr. 5/19/06 at 53-54.)  Mrs. Hayman describes how psalms sung during religious services sometimes remind her of Judith Greenbaum because she had a pretty voice and used to sing to her students.  (*Id.* at 77.)

33.  Mrs. Hayman continues to feel close to Judith Greenbaum by wearing or keeping near certain items that belonged to her daughter.  (*Id.* at 69-70, 74-76.)  To Mrs. Hayman, these items are a daily symbol of both her loss and her daughter's legacy as a great teacher who touched many lives.  (*Id.* at 69-70, 74-77.)

34.  The Haymans also find ways to celebrate their daughter's memory and recognize the gifts she left, even in her death.  For example, they created a program in honor of their daughter's memory that allows learning disabled girls to attend an orthodox Jewish school.  (*Id.* at 43-44.)  Mrs. Hayman also speaks of how her daughter's death brought goodness into her life in the form of new friends (Trial Tr. 5/19/06 at 66) and of how she

has developed relationships with the family of some of the other victims of the same

bombing (*id.* at 78).

35.    The Haymans moved to Israel at the end of 2004.  (*Id.* at 74.)  They visit their daughter's

grave every four to six weeks.  (*Id.* at 76.)  Mrs. Hayman speaks of using that time to

clean the gravesite and reflect on the positive effects of her daughter's life.  (*Id.* at 76-77.)

36.    While their personal loss is great, the Haymans also mourn the fact that the world has

been deprived of the gifts Judith Greenbaum brought as a teacher.  (Trial Tr. 5/19/06 at

82-83.)

37.    Steven Greenbaum has similarly found ways to celebrate the beauty of Judith

Greenbaum's life rather than merely mourning her death and retaining her in his

memories.  He developed two web sites, which have become popular around the world,

that publish stories recounting acts of kindness in Jewish and non-sectarian communities.

(*Id.* at 107-13.)  Steven Greenbaum also travels to high schools and other venues to speak

about kindness.  (*Id.* at 111-15.)

38.    Mr. Greenbaum is now forty-three years old.  It is difficult for him to live as a single man

in an orthodox Jewish community that prizes marriage and family.  (*Id.* at 115.)

39.    Steven Greenbaum believes that his wife was a very special person.  (*Id.* at 116.)  He

describes her as a person "who made people great."  (Trial Tr. 5/19/06 at 116.)

## CONCLUSIONS OF LAW

I.     *Legal Standard for FSIA Default Judgment*

Under the Foreign Sovereign Immunities Act, "[n]o judgment by default shall be entered

by a court of the United States or of a state against a foreign state . . . unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232-33 (D.C. Cir. 2003), *cert. denied*, 542

U.S. 915 (2004).  Plaintiffs' evidence may take the form of affidavits and, where uncontroverted,

may be accepted as true by this Court.  *See Bodoff*, 424 F. Supp. 2d at 82 (quoting *Campuzano*,

281 F. Supp. 2d at 268).

II.    *Jurisdiction*

The Foreign Sovereign Immunities Act provides the sole basis for asserting jurisdiction

over foreign sovereigns in the United States.  *See Argentine Republic v. Amerada Hess Shipping

Corp.*, 488 U.S. 428, 434-35 (1989).  The "state-sponsored terrorism" exception removes a

foreign sovereign's immunity to suit in U.S. courts where money damages are sought against a

foreign state for personal injury or death that was caused by an act of torture, extrajudicial

killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as

defined in section 2339A of title 18) for such an act if such act or provision of material support is

engaged in by an official, employee, or agent of such foreign state while acting within the scope

of his or her office, employment, or agency.  28 U.S.C. § 1605(a)(7).

To subject a foreign sovereign to suit under section 1605(a)(7), plaintiffs must

demonstrate: (1) that the foreign sovereign was designated by the State Department as a "state

sponsor of terrorism"; (2) that the victim or plaintiff was a U.S. national at the time the acts took

13

place; and (3) that the foreign sovereign engaged in conduct that falls within the ambit of the statute, in this case, providing material support or resources for an act of extrajudicial killing.

Each of the requirements has been satisfied in this case. Defendant Iran is, and was at the time of the attack, designated a state sponsor of terrorism. *See* 31 C.F.R. § 596.201 (2001). The victim and the plaintiffs were all U.S. nationals at the time of the attack. Defendant Iran's knowing support of an entity that committed an extrajudicial killing squarely falls within the ambit of the statute. As to defendant MOIS, it is treated as the state of Iran itself, *Roeder*, 333 F.3d at 234, and thus the same determinations apply to its conduct.

Personal jurisdiction over a non-immune foreign sovereign exists so long as service of process has been made under section 1608 of the FSIA. *See Stern* v. *Islamic Republic of Iran*, 271 F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.). Such service has been made, and this Court has in personam jurisdiction over defendants Iran and the MOIS.

III.     *Liability*

    A.          *Proper Causes of Action Under the FSIA*

Once a foreign state's immunity has been lifted under section 1605 and jurisdiction is proper, section 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Section 1606 acts as a "pass-through" to substantive causes of action against private individuals that may exist in federal, state or international law. *See Dammarell II*, 2005 WL 756090, at *8-10, 2005 U.S. Dist. LEXIS 5343, at *27-32.

In this case, state law provides a basis for liability. First, the law of the United States applies rather than the law of the place of the tort or any other foreign law. This is because the

14

United States has a "unique interest" in having its domestic law apply in cases involving terrorist attacks on United States citizens.  *See Dammarell II*, 2005 WL 756090, at *20, 2005 U.S. Dist. LEXIS 5343, at *63.

Second, the applicable state law is that of New Jersey and of California.  As the forum state, District of Columbia choice of law rules apply to determine which state's law shall apply. Under District of Columbia choice of law rules, courts employ a refined government interest analysis under which they "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Hercules & Co. v. Shama Rest. Corp.*, 566 A. 2d 31, 41 (D.C. 1989) (citations and internal quotations omitted).  This test typically leads to the application of the law of plaintiff's domicile, as the state with the greatest interest in providing redress to its citizens.  *See Dammarell II*, 2005 WL 756090, at *20-21, 2005 U.S. Dist. LEXIS 5343, at *66-67 (citing RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 402(3) (1987)). Accordingly, the claims of plaintiffs Alan and Shirlee Hayman shall be governed by their domicile at the time of the attack, California.  The claims of plaintiff Steven Greenbaum shall be governed by his domicile at the time of the attack, New Jersey.  Finally, the claims of the Estate of Judith Greenbaum shall be governed by her domicile at the time of the attack, New Jersey. There are no other American states with an interest in the case; therefore, application of California and New Jersey law, respectively, is proper.

Third, as required by 28 U.S.C. § 1606, California and New Jersey law provide a cause of action against private individuals for the kind of acts that defendants allegedly committed. Plaintiffs seek damages for wrongful death and intentional infliction of emotional distress, each

of which is a tort for which private individuals may face liability.  The Court's next task is to determine whether plaintiffs have demonstrated defendants' liability and their right to damages under the laws of California and New Jersey.

      B.     *Vicarious Liability*

      The purported basis of defendants' liability is that they provided material support and resources to Hamas, the organization that personally completed the attack.  One party may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting and inducement.  This Court finds that civil conspiracy provides a basis of liability for defendants Iran and MOIS.

      1.     *New Jersey*

      A civil conspiracy exists under New Jersey law where there is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages."  *Morgan v. Union County Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super Ct. App. Div. 1993) (internal citations omitted).

      The agreement may be inferred from conduct.  *Id.* at 999 (noting that plaintiff is "not required to provide direct evidence of the agreement between the conspirators" and that the "unlawful agreement need not be express") (citations omitted).  Where there is no direct evidence of an agreement between the alleged co-conspirators, the factfinder "may infer from the circumstances that [the alleged conspirators] had a meeting of the minds and thus reached an

16

understanding to achieve the conspiracy's objectives." *Id.* at 998 (internal quotations and citations omitted).

Here, it has been established that Hamas agreed together with defendants Iran and MOIS to commit terrorist activities in furtherance of the goals of eradicating the Jewish state of Israel and promoting Islamic ideology. *See Weinstein*, 184 F. Supp. 2d at 21; *Mousa*, 238 F. Supp. 2d at 9; *Eisenfeld,* 172 F. Supp. 2d at 7.  This agreement can be inferred from the comprehensive financial support and training that Iran provides to Hamas.  *See Weinstein*, 184 F. Supp. 2d at 19, ¶¶ 26-27; *Mousa*, 238 F. Supp. 2d at 4, ¶¶ 9-11, 9; *Eisenfeld*, 172 F. Supp. 2d at 5, ¶¶ 17-20, 7. Indeed, as this Court has previously noted, the very "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Bodoff,* 424 F. Supp. 2d at 84 (quoting *Flatow*, 999 F. Supp. at 27).

It is undisputed that Hamas committed the attack that killed Judith Greenbaum.  It also has been established that the attack was committed in furtherance of the broad common scheme between Hamas and Iran.  Therefore, the elements of civil conspiracy are established between the defendants in this case and the actual perpetrators of the attack.

        2.      *California*

Civil conspiracy under California law consists of "formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 511 (Cal. 1994) (internal quotations and citations omitted).  It "is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share

17

with the immediate tortfeasors a common plan or design in its perpetration actionable." *Id.* (citations omitted).

As such, the elements of civil conspiracy under California law are subsumed within the elements of the same doctrine under New Jersey law.  In this case, therefore, since the conspiracy has been demonstrated under New Jersey law, it has been demonstrated under California law as well.

      *C.*     *Wrongful Death*

Steven Greenbaum, as administrator of Judith Greenbaum's estate, asserts a claim for wrongful death.  The statute enables an administrator to bring suit for wrongful acts resulting in death for economic damages that would have been recoverable by the decedent had the act resulted only in injury, not death.  N.J. Stat. Ann. § 2A:31-1, 31-2, 31-5 (2006).  Any recovery, however, is payable to the persons entitled to intestate distribution of the decedent's estate, not to the estate itself.  *See F.F. v. G.A.D.R.*, 750 A.2d 786, 788-89 (N.J. Super. Ct. App. Div. 2000). New Jersey intestate distribution law dictates that, when the decedent was married and had no children, all of the decedent's property – including any damages recovered under the Wrongful Death Act – shall be distributed to the spouse.  N.J. Stat. Ann. § 3A:4-3.

It is axiomatic that murder is a wrongful act.  This Court has already determined, as a matter of fact and law, that defendants are vicariously liable for perpetrating a suicide attack that murdered Judith Greenbaum and several other innocent civilians.  Accordingly, plaintiff Steven Greenbaum as administrator of the estate of Judith Greenbaum has demonstrated his right to recovery under the New Jersey Wrongful Death Act.

      *C.*     *Intentional Infliction of Emotional Distress*

18

The Haymans and Steven Greenbaum in his personal capacity assert a claim for intentional infliction of emotional distress ("IIED") under their respective state's common law. California and New Jersey each not only recognize the tort, but define it to include substantially similar elements.  Accordingly, all of the IIED claims will be discussed together.

To satisfy the elements of IIED, the plaintiff must show that defendants committed an act (1) intentionally or recklessly as to the act and as to its causing emotional distress; (2) that was extreme and outrageous, *i.e.*, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community"; (3) that proximately caused the plaintiff's emotional distress; and (4) that the emotional distress suffered by the plaintiff is "so severe that no reasonable man could be expected to endure it."  *See Buckley v. Trenton Sav. Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988) (citing Restatement (Second) of Torts, § 46 cmt. d (1965)) (citations and internal quotations omitted); *Cervantez v. J.C. Penney Co.*, 595 P.2d 976, 983 (Cal. 1979).

Each element is satisfied here.  First, Iran intentionally provided material support to Hamas, and did so with the intent that Hamas would carry out attacks that would cause severe emotional distress.  Terrorist acts, by their nature, are intentionally designed to inflict harm, and thereby to cause severe emotional distress.  (*See* Dr. Clawson Dep. (Ex. 14) at 28 ("[T]he Iranian Government has no doubt that many of those killed are, in fact, children and other civilians and that the relatives and friends of those killed . . . suffer psychological damage as a result.").) Second, the act of engaging in terrorism by means of material support and civil conspiracy is extreme, outrageous, and goes beyond all possible bounds of decency.  Terrorists seek to cause

extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous.

Third, this Court has already determined that defendants' actions proximately caused the death of decedent and subsequent emotional distress of her family. Fourth, this Court has also determined that the emotional distress suffered by the Haymans due to the loss of their only daughter and unborn grandchild has been, and will continue to be, more severe than a reasonable person would be expected to endure. The same is true for Steven Greenbaum's loss of his new wife and their unborn child.

Neither state's law requires the plaintiff's presence during the act, but where the plaintiff was not present, the law requires that the act was directed at the plaintiff insofar as it caused profound and extreme emotional consequences. *See Delia S. v. Torres*, 184 Cal. Rptr. 787, 794-95 (Cal. Ct. App. 1982); *cf. also Marlene F. v. Affiliated Psych. Med. Clinic, Inc.*, 770 P.2d 278, 286 & n.4 (Cal. 1989) (Arguelles, J., concurring) (collecting cases); *Buckley*, 544 A.2d at 864 (noting that "when the intentional conduct is directed at the plaintiff, he or she need not prove any physical injury . . . [i]t suffices that the conduct produce emotional distress that is severe") (internal citations omitted). California and New Jersey each attribute this requirement to concern about the genuineness of such claims. The requirement is satisfied in this case: terrorist acts such as the one that caused JudithGreenbaum's death are directed at the relatives of the victims as well as at the victims themselves. *See, e.g., Dammarell v. Islamic Republic of Iran,* 404 F. Supp. 2d 261, 283 (D.D.C. 2005) (Bates, J.) (citing *Salazar*, 370 F. Supp. 2d at 115 n.12). Additionally, it should be noted that this act was so outrageous that this Court has no doubt that as to the genuineness of plaintiffs' claims for emotional distress.

20

IV.     Damages

To obtain damages against these defendants under the FSIA, the plaintiffs must prove that the consequences of the defendant's conduct were "reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages." *Salazar*, 370 F. Supp. 2d at 115-16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotations omitted). Punitive damages are not available against foreign states.[1]  Accordingly, plaintiffs' claim for punitive damages is denied.

Here, it was reasonably certain that Judith Greenbaum's death and the attendant emotional distress by her parents and husband would occur.  The plaintiffs have shown that Iran has been engaged in an ongoing campaign of terror intended to kill innocent civilians, including U.S. citizens in Israel, in an effort to terrorize their families and others.  Each plaintiff is entitled, therefore, to compensatory damages for emotional distress, and Steven Greenbaum in his capacity as administrator of his wife's estate, is entitled to compensatory damages for the loss of accretions to his wife's estate.

A.      Alan and Shirlee Hayman

As a result of the wrongful conduct of defendants Iran and the MOIS, plaintiffs Alan Hayman and Shirlee Hayman have suffered, and will continue to suffer, pain and mental anguish.

---

[1] Plaintiffs' request for punitive damages appears to rely on an outdated interpretation of the law.  A number of recent cases compel the determination that punitive damages are not available in this action against either Iran or the MOIS.  *See, e.g., Roeder*, 333 F.3d at 234*; Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 n.2 (D.D.C. 2006) (Lamberth, J.); *Holland*, 2005 U.S. Dist. LEXIS 40254, Civ. A. No. 01-1924 (CKK); *Dammarell*, 404 F. Supp. 2d at 274; *Collett v. Socialist Peoples' Libyan Arab Jamahiriya,* 362 F. Supp. 2d 230, 243 (D.D.C. 2005) (Urbina, J.); *Kapar v. Islamic Republic of Iran*, Civ. A. No. 02-78 (HHK), at 19 n.3 (D.D.C. 2004) (Kennedy, J.).

Since a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, the Haymans are entitled to the typical array of damages that may be awarded against tortfeasors in California.

The appropriate compensatory damages for plaintiffs' pain and suffering due to intentional infliction of emotional distress may be guided not only by prior decisions awarding damages for pain and suffering, but also by those which awarded damages for solatium.  *See Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 161 (D.D.C. 2006) (Lamberth, J.); (citing cases and noting that "[w]hile intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress").

As this Court has previously noted, compensatory damage awards in cases like this one are typically calculated "by the nature of the relationship [between plaintiff and victim] and the severity and duration of the pain suffered by the family member."  *Haim*, 425 F. Supp. 2d at 75. The awards seek to recognize a plaintiff's emotional distress immediately after the attacks as well as the continued suffering that results from the loss of a normal relationship, or any relationship at all, with one's child.

Applying these considerations to the facts of this case, this Court finds that Alan and Shirlee Hayman suffered a great deal of mental anguish in the days surrounding the attack.  For several hours, they did not know whether their daughter had been killed in the bombing.  (Trial Tr. 5/19/06 at 26-32, 63-65.)  While in the professional, impersonal environment of their respective workplaces, Mr. and Mrs. Hayman were forced to suffer the uncertainty of not knowing what had happened to their daughter – whether she was injured and needed their help,

22

whether she was already dead, or whether she had escaped injury altogether.  (*Id.*)  Mr. Hayman

spoke to family members in Israel several times, who were also distressed and searching for

news.  (*Id.* at 28-30.)  He received false hope when it was reported, and then later retracted, that

his daughter was safe.  (*Id.* at 29-30.)  Upon leaving work, still not knowing what had happened

to his daughter, he suppressed his suffering enough to drive some distance in heavy traffic to pick

up his wife at her workplace.  (*Id.* at 31-32.)  He learned that his daughter and unborn grandchild

were dead while sitting in his vehicle waiting outside his wife's workplace.  (Trial Tr. 5/19/06 at

32.)  He then suffered the pain of having to tell his wife.  (*Id.*)  Both of them suffered severe

mental anguish upon learning the news, and then returned home.  (*Id.* at 32-33, 64-65.)

 In addition to the "typical" mental anguish that might be expected in a case like this, Mr.

and Mrs. Hayman also suffered emotional distress from factors unique to this case.  They were

unable to attend their daughter's funeral.  (*Id.* at 33, 35.)  While attempting to mourn, they

received a threat so serious that they hired a security guard to stand outside their house so that

they might be safe to mourn the loss of their daughter.  (*Id.* at 52-53.)  They received a number of

visitors and gifts that were difficult reminders of their daughter.  (Trial Tr. 5/19/06 at 37, 65.)

 Shortly after the death of their daughter, and within days of attending memorial services

on the thirty-day anniversary of her death, the Haymans suffered through a painful reminder of

the attack on September 11, 2001, when terrorist attacks occurred in this country.  (*Id.* at 52.)

 Even as time has passed, the Haymans have continued to mourn the loss of their daughter,

and to mourn the loss of the relationship and experiences they might have shared had she and her

unborn child survived.  (*Id.* at 53-54, 60, 63, 69-70, 74-76, 77.)  While mental anguish is

extremely difficult to quantify, courts typically award parents $5 million in compensatory

damages for suffering related to the death of a child.  *See, e.g., Eisenfeld*, 172 F. Supp. 2d at 8

(awarding $5 million each to the parents of victims of a suicide bombing on a passenger bus);

*Flatow*, 999 F. Supp. at 31 (awarding $5 million to each parent of victim who was killed in a

suicide bombing on a passenger bus).  Taking all of the relevant factors into account, this Court

finds that Alan and Shirlee Hayman are each entitled to an award of $5,000,000.  Such an award

recognizes their closeness with their daughter, the severity of their pain and suffering in the days

immediately after the attack to the present, and the continued pain and suffering they will likely

suffer throughout their lives.

        *B.*     *Steven Greenbaum as Administrator of the Estate of Judith Greenbaum*

        Under New Jersey law, damages recoverable under the Wrongful Death Act are limited to

(1) loss of earning capacity; (2) out-of-pocket expenses; and (3) pain and suffering.  *See Arenas*

*v. Gari*, 706 A.2d 736, 748 (N.J. Super. Ct. App. Div. 1998).  The report of Dr. Lurito admitted

into evidence calculates that loss of accretions to Judith Greenbaum's estate total $879,023.

Steven Greenbaum also seeks damages for loss of accretions to himself based on the loss of his

wife's household services.  He fails, however, to direct the Court to any New Jersey case law –

and this Court's research has revealed none – indicating that such losses are ever compensable

under the Wrongful Death Act.  Accordingly, such damages will not be awarded.  The damages

awarded shall be limited to $879,023, to be distributed to himself in his personal capacity as the

husband of the decedent.

        *C.*     *Steven Greenbaum in his personal capacity*

        As a result of the wrongful conduct of defendants Iran and the MOIS, plaintiff Steven

Greenbaum has suffered, and will continue to suffer pain and mental anguish.  Since a "foreign

state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, plaintiff is entitled to the typical array of damages that may be awarded against tortfeasors in New Jersey.

As noted previously, the compensatory damages award may be determined by prior awards for solatium as well as pain and suffering.  This Court must consider "the nature of the relationship [between plaintiff and victim] and the severity and duration of the pain suffered by the family member."  *Haim*, 425 F. Supp. 2d at 75.

Applying these considerations to the facts of this case, this Court finds that Steven Greenbaum suffered a great deal of mental anguish in the days surrounding the attack.  For several hours, he did not know whether his wife had been killed in the bombing.  (Trial Tr. 5/19/06 at 29.)  He had spoken to her mere hours prior to learning about the attack, and thus did not think she could have been injured.  Indeed, he had left her presence only a few days prior and thus could not imagine that she was gone.  He suffered the uncertainty of not knowing what had happened to his wife and their unborn child.  When he finally learned what had happened, he was faced with the agonizing decision – which had to be made immediately – whether to risk his own safety and travel to Israel for his wife's funeral.  (*Id.* at 34.)  He decided to do so, and immediately traveled to Israel where he was a pallbearer in her funeral.  (*Id.* at 102-03.)  Upon returning home, Steven Greenbaum mourned for seven days in his rabbi's home.  He received a number of visitors that were difficult reminders of his wife.  Shortly after his return, he suffered through a powerful reminder of the attack when the September 11, 2001 attacks occurred, which included a devastating attack in New York City.  (*Id.* at 107.)

25

Several years have passed since Steven Greenbaum lost his wife and unborn child.  Yet he continues to suffer the pain and anguish of the loss.  He speaks of the difficulty of being unmarried in a community that prizes marriage and family.  (*Id.* at 115.)  He does not anticipate remarrying.  Encouraged by the positive energy that his wife brought into so many lives, Steven Greenbaum has chosen to use the experience to teach kindness to others: he speaks to high school students and other groups across the country.  He has also created web sites that focus on positive experiences.  While mental anguish is extremely difficult to quantify, courts typically award spouses between $8 million and $12 million for pain and suffering resulting from the death of a spouse.  *See, e.g., Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000) (Jackson, J.) (awarding $10 million to the wife of a hostage and torture victim); *Weinstein* (granting $8 million to the widow of a bus bombing victim); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59, 64 (D.D.C. 2003) (awarding $10 million to the widow of a murder victim); *Salazar,* 370 F. Supp. 2d at 116 (awarding $10 million to the widow of a bombing victim).

Taking all of the relevant factors into account, this Court finds that Steven Greenbaum is entitled to an award of $9,000,000.  Such an award is commensurate with other cases with similar circumstances, and recognizes his closeness with his wife, and the severity of his pain and suffering due to the loss of his wife and unborn first child.

While this Court does not deny the severe pain that Steven Greenbaum endures as a result of the terrorist attack that killed his wife, larger awards are typically reserved for cases with aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnaping of a spouse, or in which the victim survives with

severe physical and emotional conditions that continue to cause severe suffering by the spouse. *See, e.g., Cicippio*, 18 F. Supp. 2d at 70 (granting $10 million to spouses of surviving hostage victims whose suffering "may have exceeded the grief normally experienced as a result of the death of a loved one, and will in all likelihood continue to do so into an uncertain future"); *see also Acree*, 271 F. Supp. 2d at 222 (attributing more than half of $10 million awards to widows of hostage victims to difficulties anticipated in the period following release of their husbands).

## CONCLUSION

This Court takes note of plaintiffs' courage and steadfastness in pursuing this litigation and their efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  Their efforts are to be commended.

A judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, August 10, 2006.

27